# EXHIBIT A

| 106TH CONGRESS 1st Session | HOUSE OF REPRESENTATIVES | REPT. 106–74 Part 3 |
|---|---|---|

## FINANCIAL SERVICES ACT OF 1999

---

JUNE 15, 1999.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

Mr. BLILEY, from the Committee on Commerce, submitted the following

# R E P O R T

together with

## ADDITIONAL VIEWS

[To accompany H.R. 10]

The Committee on Commerce, to whom was referred the bill (H.R. 10) to enhance competition in the financial services industry by providing a prudential framework for the affiliation of banks, securities firms, and other financial service providers, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

CONTENTS

| | Page |
|---|---|
| Amendment | 2 |
| Purpose and Summary | 98 |
| Background and Need for Legislation | 110 |
| Hearings | 120 |
| Committee Consideration | 120 |
| Roll Call Votes | 120 |
| Committee Oversight Findings | 129 |
| Committee on Government Reform Oversight Findings | 129 |
| New Budget Authority, Entitlement Authority, and Tax Expenditures | 129 |
| Committee Cost Estimate, Congressional Budget Office Estimate, and Unfunded Mandates Statement | 129 |
| Advisory Committee Statement | 129 |
| Constitutional Authority Statement | 129 |
| Applicability to Legislative Branch | 129 |
| Section-by-Section Analysis of the Legislation | 130 |
| Changes in Existing Law Made by the Bill, as Reported | 207 |
| Additional Views | 336 |

57–325

109

cautions against liability; to respond to judicial process, to the extent permitted or required under other provisions of law and in accordance with the Right to Financial Privacy Act of 1974; to provide information to law enforcement agencies or for an investigation on a matter related to public safety; to provide information to a consumer reporting agency in accordance with the Consumer Credit Protection Act; or in executing a sale or exchange whereby the financial institution transfers the business unit or operation, or substantially all the assets of the business unit or operation with which the customer's transactions were effected.

The scope of these exceptions is designed to ensure that the disclosure, access, and opt-out rules promulgated by the FTC pursuant to the subtitle do not impede the ability of financial institutions, consistent with the purposes of this subtitle, to provide a multitude of services in an efficient manner to their customers. The Committee intends that the definitions of the terms used in the exception provisions, including the exemptive and rulemaking authority granted to the FTC regarding these terms, will be applied in a manner, consistent with the subtitle's goal of providing consumers with a reliable means to protect their personal financial information.

*Enforcement*

The subtitle designates the FTC to enforce the subtitle and the rules prescribed thereunder. The FTC is to use this enforcement authority in the same manner, with the same authority and using the same remedies, as are provided by the Federal Trade Commission Act, with respect to all financial institutions.

SUBTITLE B

Subtitle B addresses the practice of "pretexting," that is, the obtaining of personal confidential information from financial institutions under false pretenses. This subtitle provides additional protections against pretexting violations by increasing the penalties for fraudulent information gathering and providing specific direction to the FTC to prosecute such fraudulent activities.

The subtitle makes it unlawful for any person to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed to any person, customer information of a financial institution relating to another person by (1) making a false, fictitious, or fraudulent statement or representation to an officer, employee, or agent of a financial institution; (2) making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution; or (3) providing any document to an officer, employee, or agent of a financial institution, knowing that the document is forged, counterfeit, lost, or stolen, was fraudulently obtained, or contains a false, fictitious, or fraudulent statement or representation.

The subtitle also makes it unlawful to request a person to obtain customer information of a financial institution knowing that it was or will be obtained through any of the three methods described in this section.

The subtitle provides exceptions for law enforcement actions and for actions by a financial institution to (1) test its security systems;

110

(2) investigate allegations of misconduct or negligence on the part of its officers, employees, or agents; or (3) recover customer information of the financial institution obtained by means of pretexting by another person. Thus, for example, when a fraud prevention unit of a financial institution succeeds in retrieving information from an information broker that has been obtained through fraud or deceit, the financial institution is not in violation of this statute. This "safe harbor" extends to agents, officers, or employees retained by a financial institution to implement anti-fraud or self-testing programs.

The subtitle's prohibitions do not apply to instances in which an insurance institution or its officers, employees or agents, obtain information as part of an insurance investigation into criminal activity, fraud, material misrepresentation, or material nondisclosure that is authorized for such institution under State law, regulation, interpretation, or order. There is also an exception for information that is otherwise available as a public record filed pursuant to the Federal securities laws.

The Committee does not intend that any provision of subtitle B be construed as limiting, expanding, or in any way interfering with the sharing of information among affiliates or subsidiaries within a financial services institution as permitted under any other applicable law, including the new delegations established under subtitle A.

The subtitle designates the FTC as the enforcer of the subtitle. It also provides for criminal penalties for knowing and intentional violations of the subtitle. It preempts State authority only to the extent that the State's laws, regulations, orders, or interpretations are inconsistent with the Act.

The subtitle requires regulators to review their regulations and guidelines governing the protection of confidential consumer financial information and to revise such provisions as necessary to ensure appropriate confidentiality safeguards. The Committee expects the appropriate examining authorities to include compliance with such guidelines and the adequacy of such internal controls in their examinations of these institutions.

The subtitle also requires a report by the Comptroller General regarding the effectiveness of the Act in preventing the fraudulent obtaining of confidential consumer financial information. The Federal Trade Commission and the Attorney General also must submit to Congress an annual report on their enforcement actions pursuant to the legislation.

BACKGROUND AND NEED FOR LEGISLATION

The Glass-Steagall Act imposes barriers between commercial banking, commonly the taking of deposits and the making of commercial loans, and investment banking, the raising of capital for companies through the public offering of securities. The stated legislative purpose for the Glass-Steagall Act, passed in the wake of the stock market crash of 1929 and the ensuing Depression, was to prevent banks from engaging in activity deemed at the time to be too risky for banks, such as securities underwriting, and to prevent conflicts of interest between commercial and investment banking, which were thought to have led to speculative frenzy on the

111

stock market. The principal Federal statute governing securities activity, the Securities Exchange Act, was enacted in 1934. Because commercial banks effectively were barred from the securities industry by the Glass-Steagall Act, the Exchange Act excluded banks from the definitions of "broker" and "dealer", effectively excluding banks from broker-dealer regulation under the Federal securities laws.

In recent years, the financial services industry has undergone significant change, largely as a result of administrative actions by Federal banking regulators. Actions by the OCC and by the Federal Reserve Board have enabled banks to become increasingly engaged in securities and insurance activities. Notably, the erosion of these limitations has resulted from administrative, rather than Congressional action, by broad interpretations of the Glass-Steagall Act and the National Bank Act.

In November of 1996, the OCC announced interpretive changes to Part 5 of the National Bank Act, greatly expanding the standard for determining the scope of permissible activities for national banks. Pursuant to this interpretive action, national banks would be permitted, through their operating subsidiaries, to engage in activities that are statutorily prohibited to the bank itself. Based on these interpretive changes by the Comptroller, national banks to date have applied to the Comptroller for the authority to conduct real estate development in an operating subsidiary and to underwrite municipal revenue bonds in an operating subsidiary. As noted above, the Committee finds that the Comptroller's interpretive changes to Part 5 are ultra vires.

The OCC has further undertaken numerous "reinterpretations" of the National Bank Act to authorize increased national bank insurance activities. Of particular note is a decision by the OCC to reinterpret Federal banking laws to authorize national banks to sell insurance nationwide through small town branches. The OCC has also expanded the sphere of bank-eligible and incidental products into what many insurance underwriters have argued is their traditional authority.

The Federal Reserve Board also has taken action that has expanded the extent to which bank holding companies, through their affiliates, may engage in securities activities. Originally, in 1987, the Federal Reserve Board permitted a bank holding company affiliate to derive no more than 5 percent of its gross revenues from securities activities. This limitation was designed to comply with the language of section 20 of the Glass-Steagall Act prohibiting commercial bankers from being "engaged principally" in investment banking. In 1989, the Federal Reserve Board raised the so-called "section 20 caps" to 10 percent of the affiliate's gross revenues, and in 1996, raised the caps again to 25 percent. In August of 1997, the Federal Reserve Board rescinded many of the prudential restrictions, commonly referred to as firewalls, imposed in its original section 20 order and designed to prevent the risks of securities underwriting and dealing from being passed to an affiliated bank. The Federal Reserve Board consolidated the remaining restrictions as a series of eight operating standards.

The administrative actions of the OCC have led to numerous court battles to define permissible lines of activities among finan-

112

cial services providers, focusing primarily upon activities involving insurance sales and underwriting. The actions of banking regulators expanding the permissible securities activities of banks have also led to competitive imbalances among financial services providers, by providing for differing regulatory schemes among banks, securities firms, and insurance providers engaged in the same activities. The ability of banks to own securities firms and engage in securities and insurance activities, while securities and insurance firms are unable to own banks, has given banks competitive advantages that are unavailable to securities and insurance firms.

The Financial Services Act of 1999 addresses these developments by creating a new regulatory structure that permits affiliations among different financial services providers, provides for functional regulation of securities activities, and preserves State regulation of insurance activities, while preserving the ability of banks to engage in traditional banking activities.

*Affiliations*

Title I of the bill eliminates the barriers to affiliation among financial services providers that are contained in the Glass-Steagall Act of 1933 and the Bank Holding Company Act of 1956, and creates a new type of financial holding company that is permitted to control banks, securities firms, insurance companies, and other financial firms. As a result, for the first time, securities firms and insurance companies would be permitted to own or affiliate with a commercial bank, thus creating competitive equality among financial services providers. Financial holding companies would be subject to streamlined oversight by the Federal Reserve Board to ensure that activities of the holding company and its affiliates are consistent with the preservation of the safety and soundness of the U.S. banking system and monetary system and are not subject to unnecessary or duplicative Federal regulation.

Title I also includes provisions limiting the powers of operating subsidiaries of national banks to only those powers that are permissible for national banks to engage in, except that the title also authorizes national banks to own operating subsidiaries that are engaged in financial activities solely as agent, including insurance agency activities. These provisions are designed to limit the expansion of the Federal safety net that many argue would result if operating subsidiaries, which enjoy the subsidy created by the existence of Federal deposit insurance, access to the Federal payment system, and favorable access to the Federal Reserve Board discount window, were able to engage in securities and other activities that are prohibited to their parents, and to prevent the competitive disparities that would result from such an expansion of the Federal safety net. In hearings before the Subcommittee on Finance and Hazardous Materials, Federal Reserve Board Chairman Alan Greenspan raised concerns with respect to the competitive disparity that would be created by permitting national bank operating subsidiaries to engage in activities, such as securities underwriting activities, not permitted to the national bank itself:

> * * * one cannot eliminate the fact that equity investment in [bank] subsidiaries is funded by the sum of in-

113

sured deposits and other bank borrowings that directly benefit from the subsidy of the safety net.

Thus, inevitably, a bank subsidiary must have lower cost of capital than an independent entity and even a subsidiary of the bank's parent [(*e.g.*, a separately capitalized affiliate)]. Indeed, one would expect that a rational banking organization would, as much as possible, shift its nonbank activity from the bank holding company structure to the bank subsidiary structure. Such a shift from affiliates to bank subsidiaries would increase the subsidy and the competitive advantage of the entire banking organization relative to its nonbank competitors. (Testimony of Alan Greenspan, Chairman, Board of Governors of the Federal Reserve System, before the Committee on Banking and Financial Services, February 13, 1997. PRINTED, Serial No. 105–1, Committee on Banking and Financial Services).

*Functional regulation*

The Committee on Commerce strongly believes that functional regulation—regulation of the same functions, or activities, by the same expert regulator, regardless of the nature of the entity engaging in those activities—has become essential to a coherent financial regulatory scheme, as activities and affiliations expand and change within the financial marketplace. Title II amends the Federal securities laws to provide for functional regulation of securities activities.

Subtitle A of title II amends the Exchange Act to eliminate the blanket exemptions for banks from the definitions of "broker" and "dealer." These exceptions, which have been part of the Exchange Act since its inception, were included in the Exchange Act based on the assumption that the Glass-Steagall Act, which had become law just one year before the Exchange Act, had prohibited all but extremely limited specified bank securities activities. Specifically, at the time of its enactment, the Glass-Steagall Act included exceptions that permitted banks to underwrite and deal in obligations of the United States and many of its instrumentalities, as well as obligations of States and their subdivisions. Amendments to the Glass-Steagall Act made in 1935 permitted banks to provide limited securities brokerage services as an accommodation to their customers, by permitting banks to engage in stock purchases and sales in an "agency" capacity, at the request of customers.

Section 20 of the Glass-Steagall Act forbids affiliation of any Federal Reserve member bank with any business entity "principally engaged" in investment banking activities. For more than fifty years following the enactment of the Glass-Steagall Act, bank holding companies could not underwrite securities.

As noted above, however, the limitations on bank securities activities have eroded as a result of administrative actions by Federal banking regulators. The rationale for the exemptions in the Federal securities laws that apply to banks is, thus, no longer sound, given the extensive and increasing securities activities in which banks are engaging.

114

In addition, these exemptions have created a competitive disparity between competitors in the financial services marketplace by permitting banks to engage in securities activities without being subject to the same regulatory requirements that apply to broker-dealers engaging in the same activities. The Committee is also greatly concerned that these exemptions have permitted banks to engage in securities activities for investors who are not protected by the provisions of the Federal securities laws.

Blanket exemptions from securities regulation no longer work for banks actively participating in securities activities. The Committee believes that functional regulation is necessary to ensure that all entities engaged in securities activities and securities professionals are regulated by the same regulatory scheme, administered by the same functional regulator: the Securities and Exchange Commission, which has over 60 years of expertise focused specifically on these activities. The Committee recognizes, however, that certain limited existing bank securities activities may remain excepted from SEC regulation without significantly jeopardizing investor protection and market integrity, based on the limited nature of certain activities and the existing scheme of regulation of other activities.

The limited exceptions from the definitions of "broker" and "dealer" in H.R. 10 reflect the Committee's commitment to ensure that activities that require securities regulation are subject to the Federal securities laws, with minimal disruption of traditional banking activities. The Committee has crafted these exceptions to preserve the ability of banks to continue to engage in activities that are connected to traditional banking activities, while preventing activities that should be subject to securities regulation from being conducted by banks without functional regulation. The Committee also notes that in the National Securities Markets Improvement Act of 1996 (Public Law 104–290, October 11, 1996), it gave the SEC broad exemptive authority as new Section 36 of the Exchange Act and that authority can be used should banks require additional exemption in this area.

*Insurance*

Ever since the Great Depression and the enactment of Glass-Steagall barriers between banking and commerce, questions have been raised over the extent to which banks should be allowed to participate in traditionally non-banking activities such as insurance. Recent regulatory actions by the OCC have greatly increased the controversy over appropriate bank insurance powers.

The Committee's concern over the recent trend towards expansion of bank insurance powers is partly a recognition of the differing goals of traditional banking and insurance regulators. The primary goal of Federal banking regulators is to protect the liquidity and solvency of the banking system. In contrast, insurance regulators are primarily focused on market conduct of agents in terms of consumer protection and the long-term ability of underwriters to pay claims in order to protect insurance consumers and State insurance guarantee funds. These objectives are sometimes in conflict, particularly in relation to the transfer of funds between bank and insurance affiliates.

115

Banks are allowed to choose between a State or Federal charter and have some degree of regulatory arbitrage available in the competition between the different regulators. In contrast to the dual regulatory system provided for banks under Federal law, insurance is governed solely at the State level, by fifty separate State statutes. When the Supreme Court in 1944 tried to shift the power of insurance regulation from the States to the Federal government, Congress passed the McCarran-Ferguson Act, overturning the Supreme Court ruling and clarifying State supremacy in insurance regulation. The McCarran-Ferguson Act states that:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, * * * unless such Act specifically relates to the business of insurance. 15 U.S.C. §1012(b).

The banking and insurance regulatory systems potentially clash when banks become involved in insurance activities. Despite the limits of the McCarran-Ferguson Act, the OCC over the last decade has slowly been encouraging national banks to expand into the field of insurance, beyond what has been permissible under State law. When the OCC and State insurance regulators clash over whether a product is a banking or insurance activity and how it should be regulated, courts, as a result of the Unites States Supreme Court *Chevron* ruling, defer to reasonable interpretations of law by Federal regulators—in this case, the OCC. In *Barnett Bank of Marion County, N.A.* v. *Nelson,* the Supreme Court upheld the OCC's Federal preemption of State insurance law, ruling that State regulation would only be applicable where it did not "prevent or significantly interfere" with the Federally authorized activities of a national bank.

Because the courts are required to give deference to Federal agencies over State regulators, this gives the OCC the upper hand in choosing which insurance powers it wants to give to its Federally chartered banks, and which State laws it wants to preempt or allow. For example, the OCC has repeatedly indicated they are considering whether to preempt Rhode Island law governing bank insurance sales, which sets forth licensing and disclosure requirements, as well as limits on the sale of insurance by loan officers. The OCC has also expanded the "town of 5,000" law, which permitted bank insurance sales within small towns, to allow insurance sales nationwide through banks which have a branch in a small town.

The Committee is particularly concerned about the potential preemption of State consumer protection law by the OCC in light of recent comments made by the Comptroller and by the Secretary of the Treasury. For example, in response to a question from Senator Bryan, Comptroller Hawke stated that the OCC looks at bank insurance activities from the perspective of the relative risk the activity poses to the overall banking company. The Committee on Commerce is concerned that this sole focus on bank solvency leaves out the most important perspective—protecting the consumer. Mr. Hawke further stated that any State consumer protection that infringes or burdens the ability of a bank to sell insurance may be

116

preempted. This statement highlights the need for Congressional action to clarify the appropriate extent of State consumer protection laws governing insurance sales by Federally chartered entities.

The Committee takes further note of two recent court cases which used very strong language in condemning the Comptroller's attempted preemption of State law and accordingly limiting the ability of the OCC to expand national banks' insurance powers. In *Blackfeet National Bank* v. *Nelson,* No. 96–3021, 1999 U.S. Appellate LEXIS 6069 (11th Cir. April 4, 1999) (concluding in its primary holding that the OCC's ruling that national banks are authorized to underwrite an annuity product was precluded by the applicable provisions of the National Bank Act), the United States Court of Appeals for the 11th Circuit overturned the Comptroller's actions allowing the underwriting of retirement CD's in a national bank, finding that "the Comptroller's interpretation of the Bank Act is an unreasonable expansion of the powers of national banks beyond those intended by Congress." Id.

In *Independent Insurance Agents of America* v. *Hawke,* No. 98–cv–0562 slip op. (D.D.C. March 29, 1999) (granting the Plaintiff's Motion for Summary Judgment and concluding that the OCC's ruling that national banks located outside of small towns were authorized to sell crop insurance products was precluded by the applicable provisions of the National Bank Act), the United States District Court for the District of Columbia struck down the Comptroller's attempted expansion of bank crop insurance sales outside of towns of 5,000, stating that the language was not ambiguous and the Comptroller's interpretation was unreasonable. The OCC has now filed a notice of appeal to overturn the District Court's ruling in *IIAA* v. *Hawke,* highlighting the need for Congressional action to clarify the scope of Federal preemption and protect reasonable and nondiscriminatory State law.

The Committee recognizes, however, that a majority of States now allow their State chartered banks some degree of permissible insurance activities. Many States have "wild card" statutes which allow their State chartered banks parity with any insurance powers authorized by the OCC for Federally chartered banks, in order to equalize competition and lessen the number of banks that switch charters to take advantage of the regulator offering them the most new powers and the least regulation. The Committee also received testimony from numerous witnesses pointing out that bank insurance activities could increase consumer choice and create greater synergies, particularly in under-served communities. Additional testimony was received on the advantages of uniform national insurance standards over 50+ different State standards, many of which are arguably anti-competitive or discriminatory in nature.

In considering the appropriate level of regulation and consumer protection that should be applied to banks, the Committee took particular note of the Illinois and New York State bills governing bank insurance activities. These agreements were jointly negotiated and widely supported by all of the involved industries and addresses many of the same issues involved in the current Glass-Steagall reform legislation. The thirteen safe harbors created by the bill were largely taken from these two laws.

117

The Committee also heard testimony on the importance of distinguishing between insurance and banking products for the purpose of determining bank underwriting eligibility and regulation. When the Glass-Steagall Act was first enacted, the lines between traditional bank and insurance products were readily discernable and easy to draw. Recently, these lines have become increasingly blurred, as many modern financial products are hybrids of banking, securities, and insurance services. For example, a variable annuity might include elements of actuarial expectations (insurance), traditional bank savings, and securities investments.

Currently, the courts are required to defer to the OCC's determination of whether an insurance related instrument is a bank product, or even "incidental" to a banking product. Past legislative proposals have tried to define insurance, based on either specific definitions or according to current State law. Other proposals have separately, or in conjunction with a definition, tried to create a dispute resolution system to equalize the deference given to the banking regulator over the insurance regulators.

To create a level playing field among the industries and avoid regulatory arbitrage, a consensus developed within the Committee that an iron clad definition of insurance needed to be created, based on the tax codes and with a broad grandfathering, and an expedited dispute resolution system needed to be established to quickly adjudicate conflicts between State and Federal law and regulations governing insurance, with all issues considered on their merits without unequal deference given to either regulator. Comprehensive guidelines were also needed to set forth the standards for preemption of State law, for appropriate safe harbors for critical consumer protections, and to establish an antidiscrimination rule to govern future State insurance sales regulations. In light of these new Federal clarifications of the appropriate interaction between State and Federal law relating to insurance, the Committee also received testimony on the need for an affirmation of McCarran-Ferguson, and a heightened emphasis of the continued need for State licensing of all insurance activities.

*Thrift charter*

H.R. 10 as reported by the Committee on Commerce eliminates the availability of new unitary thrift charters and limits the transferability of existing unitary thrift charters to financial entities.

*Financial privacy*

The evolution of electronic commerce has brought privacy issues, especially financial information privacy, into the public and media spotlight. An increasing amount of personal consumer data is being stored by financial institutions, including asset and investment accounts, payments or loans related to commercial transactions, and insurance-related information. Consumers have a reasonable expectation of confidentiality for their information.

Subtitle A addresses the issue of how and when a financial institution may disclose the nonpublic personal information of their customers. Under current law, there is no requirement that financial institutions take any particular measures to fully protect the secu-

118

rity and confidentiality of the personal, nonpublic information about their customers. H.R. 10 fills in this gap.

H.R. 10 provides a regulatory structure that will enable financial institutions to expand and affiliate in ways that will bring consumers the benefits of more services, greater efficiency, and increased convenience. Already, consumers today may enjoy an increasing array of benefits stemming from alliances that financial institutions establish with unrelated third parties to provide products such as affinity programs whereby consumers earn "mileage" or other incentive points based on their transactions with a financial institution, for example, through a credit card.

As financial institutions become increasingly diversified and complex, they must rely upon databases and customer service mechanisms that require the sharing of information both within the institution itself, among its affiliates, and among various service providers, in order to provide consumers with competitive products.

At the same time, consumers have become increasingly sensitive to the use of their personal information by financial institutions as a commodity to be sold to outside parties with which the consumer has no expectation or, necessarily, desire to do business, as well as the use of that personal information by the financial institution itself in ways that are unrelated to the transaction or product the consumer originally sought from the institution.

Subtitle A provides a balanced approach to protect consumer privacy without undermining the benefit of affiliation that is the fundamental purpose of H.R. 10.

The subtitle accomplishes this by imposing a new four-pronged requirement on all financial institutions to protect consumer privacy. First, the subtitle requires that financial institutions establish a policy to protect the security and confidentiality of their customers' nonpublic personal information. Second, the subtitle requires that financial institutions provide an understandable disclosure to consumers stating exactly what their privacy policies are, in a form that will enable consumers to compare one financial institution's privacy policy against another and choose where he or she prefers to do business. Third, the subtitle requires financial institutions to give their customers the right to say no to the institution's divulgence or unrelated use of their nonpublic personal information, either with the institution's affiliates or with unrelated parties. And fourth, the subtitle requires financial institutions to provide their customers with access to, and the ability to correct errors in, any nonpublic personal information that the institution has provided for consideration to a third party (i.e., not an employee, agent, or affiliate of the institution).

These requirements are designed to provide consumers with greater privacy protection through competition—as a result of the ability consumers will have to choose among the privacy policies disclosed by competing financial institutions, as well as regulatory restrictions, in the form of the requirement that consumers be able to opt out of information sharing and gain access to and correct personal nonpublic information about themselves.

The Committee has provided for certain exceptions from these requirements, as well as directives to the FTC to promulgate rules further defining the scope of the subtitle, in order to ensure that

119

the privacy protections afforded by the subtitle do not interfere with the ability of financial institutions to effect or enforce a customer's transaction, protect confidentiality or security, take precautions against liability, respond to judicial process or provide information to law enforcement agencies, provide information to a consumer reporting agency, or effectuate a sale or merger, especially as these institutions become increasingly diversified under the regime provided by H.R. 10.

Subtitle B addresses financial privacy concerns raised by the fraudulent practices of unscrupulous individuals to obtain personal consumer information by means of "pretexting."

Private detectives, information brokers, and lawyers, among others, have been exploiting the information explosion, using false identities or other deceptive pretexts to wrongly obtain information about targeted victims from financial institutions. These "pretexters" might use information gained from one source, such as a social security number or mother's maiden name, to gather information from a second source, such as an investment account, credit card limit, or savings balance. Financial institutions are being placed in the increasingly difficult position of trying to maintain the balance between providing simple and remote access by legitimate consumers to their financial accounts while still preventing the unauthorized access to confidential information by skillful pretexters.

The FTC currently has authority under the Federal Trade Commission Act to act against persons who use deceptive practices to obtain confidential consumer information. Additionally, the use of false or deceptive methods to procure confidential financial information will often give rise to wire fraud, punishable under Title 18, United States Code. However, prosecution of fraudulent information brokers under Title 18 has not been frequent, and under current law, the FTC cannot impose civil penalties against an entity until after a second violation has occurred. Furthermore, the availability of criminal penalties are limited. Subtitle B makes it clear that, with limited exceptions for financial institutions and law enforcement agents, using pretexting to fraudulently obtain confidential customer financial information is illegal, and immediately subject to criminal and administrative punishment.

In addition, subtitle B recognizes the importance of financial institutions implementing strong internal controls to prevent unauthorized disclosure of their customers' private financial information. The legislation requires financial regulatory agencies to review their confidentiality rules and guidelines and, if necessary, make adjustments in order to ensure that supervised financial institutions maintain appropriate privacy protections.

This subtitle is largely identical to a bill approved by the Committee on Commerce in the 105th Congress, H.R. 4321, the Financial Information Privacy Act of 1998, with one exception relating to the enforcement provisions. Subtitle B conforms the enforcement treatment to that provided in subtitle A of the privacy subtitle, where enforcement is carried out by the Federal Trade Commission, rather than by private lawsuits, actions brought by State Attorneys General, or other regulators.

204

quired, or is one of the usual and accepted methods, to carry out the transaction or record or maintain the account in the ordinary course of providing the financial service or product, including providing customer confirmations, statements, records, and status reports, the accrual or recognition of incentives or bonuses associated with the transaction that are provided by any party, as well as a divulging or use that is permissible or required to enforce the rights of the financial institution or others in carrying out the transaction or providing the service.

Of particular significance is the definition of "necessary to effect or enforce," which the Committee has defined in recognition of the fact that certain businesses must share information about their customers with both affiliated and unaffiliated parties in order to provide the services that the customers have come to that institution to receive. For example, an investment company must provide information about its shareholders to a variety of affiliated and unaffiliated parties, including investment advisers, transfer agents, administrators, distributors, and others, in order to execute shareholders' investment transactions, maintain their accounts, and provide them with information about their accounts. Similarly, if a prospective purchaser of an annuity divulges nonpublic information to a marketer, and the marketer in turn provides such information to an unaffiliated issuer of annuities, such divulging or use should be considered necessary to effect a transaction with the customer whether or not the prospective annuity purchaser actually acquires the annuity. None of these activities should trigger the disclosure, opt-out, or access provisions of the title.

Other types of financial providers also must share information with affiliated and unaffiliated entities in order to carry out their ordinary business. Accordingly, the section directs the FTC to prescribe by rule actions that will be deemed necessary to effect or enforce a financial transaction, for purposes of a variety of different financial services and products.

The Committee expects that the FTC, in prescribing rules to further define the term "necessary to effect or enforce," will permit financial institutions to conduct their business efficiently and effectively, taking into account current and future developments in technology, without unnecessarily triggering the disclosure, opt-out, and access provisions of the subtitle, but to ensure that those provisions will be triggered in the case of an institution divulging or making unrelated uses of customer information outside of their customary business processes.

*Section 506. Effective date*

Section 506 sets the effective date of the subtitle as the later of one year after the date on which the FTC prescribes in final form the rules required by section 502 or any later date specified in those rules.

SUBTITLE B—FRAUDULENT ACCESS TO FINANCIAL INFORMATION

Subtitle B addresses the subject of "pretexting," that is, the obtaining of personal confidential information from financial institutions under false pretenses. This subtitle provides protection against pretexting violations by increasing the penalties for fraudu-

205

lent information gathering and enhancing the ability of the FTC to prosecute such fraudulent activities.

*Section 521. Privacy protection for customer information of financial institutions*

This section makes it unlawful for any person to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed to any person, customer information of a financial institution relating to another person by (1) making a false, fictitious, or fraudulent statement or representation to an officer, employee, or agent of a financial institution; (2) making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution; or (3) providing any document to an officer, employee, or agent of a financial institution, knowing that the document is forged, counterfeit, lost, or stolen, was fraudulently obtained, or contains a false, fictitious, or fraudulent statement or representation.

This section also makes it unlawful to request a person to obtain customer information of a financial institution knowing that it was obtained through any of the three methods described in this section.

The prohibitions specified in this section do not apply to any action by a law enforcement agency to obtain customer information of a financial institution in the performance of its official duties. For purposes of this section, the term "law enforcement agency" is intended to include Federal, State and local agencies, and specifically encompasses those agencies responsible for enforcing child-support obligations.

This section's prohibitions do not apply to instances in which a financial institution or its officers, employees, or agents, obtain customer information of such financial institution in the course of (1) testing the security procedures or systems of such institution for maintaining the confidentiality of customer information; (2) investigating allegations of misconduct or negligence on the part of any officer, employee, or agent of the financial institution; or (3) recovering customer information of the financial institution which was obtained or received by another person in any manner described in this section. Thus, for example, when a fraud prevention unit of a financial institution succeeds in retrieving information from an information broker that has been obtained through fraud or deceit, the financial institution is not in violation of this statute. This "safe harbor" extends to any officer, employee, or agent retained by a financial institution to implement anti-fraud or self-testing programs.

This section's prohibitions do not apply to instances in which an insurance institution or its officers, employees or agents, obtain information as part of an insurance investigation into criminal activity, fraud, material misrepresentation, or material nondisclosure that is authorized for such institution under State law, regulation, interpretation, or order. This section also does not apply to the obtaining of customer information of a financial institution that is otherwise available as a public record filed pursuant to the Federal securities laws.

206

The Committee does not intend that any provision of subtitle B be construed as limiting, expanding, or otherwise interfering with the sharing of information among affiliates or subsidiaries within a financial services institution as permitted under any other applicable law, including the new obligations established under subtitle A.

*Section 522. Administrative enforcement*

Section 522 designates the FTC as the enforcer of the subtitle, in the same manner and with the same power and with authority under the Fair Debt Collection Practices Act. The FTC is required to provide notice to the functional regulator of any institution against whom the FTC initiates an action under the subtitle, upon initiation of such action.

*Section 523. Criminal penalty*

This section provides that persons who knowingly and intentionally attempt to violate the subtitle are subject to criminal penalties for commission of a felony of up to 5 years imprisonment plus fines of up to $250,000 for individuals and $500,000 for corporations, with aggravated cases (significant multiple offenses or a violation of multiple laws) resulting in doubled penalties.

*Section 524. Relation to State laws*

Section 524 preempts State authority only to the extent that the State's laws, regulations, orders, or interpretations are inconsistent with the Act. If State authority provides greater protection to any person, as determined by the FTC, then that State authority remains controlling law.

*Section 525. Agency guidance*

This section requires each Federal banking agency and the SEC or self-regulatory organizations to review their regulations and guidelines governing the protection of confidential consumer financial information and to revise such provisions as necessary to ensure appropriate confidentiality safeguards. Those safeguards will include those policies, procedures, and controls as would reasonably be expected to prevent and detect, insofar as practicable, activities proscribed by the legislation. The Committee expects the appropriate examining authorities to include compliance with such guidelines and the adequacy of such internal controls in their examinations of these institutions.

*Section 526. Reports*

Section 526 requires that, within 18 months of enactment, the Comptroller General will consult with the FTC, SEC, appropriate Federal banking and law enforcement agencies, and relevant State insurance regulators, and report to Congress on the effectiveness and adequacy of the Act in preventing the fraudulent attempts to obtain confidential consumer financial information, as well as any recommendations for additional legislative or regulatory action that is appropriate. The regulatory bodies charged with enforcing the bill must submit to Congress an annual report on their enforcement actions pursuant to the legislation.

207

*Section 527. Definitions*

This section defines several terms. The term "customer" is defined as any person to whom a financial institution provides a product or service, including that of acting as a fiduciary. It also defines the term "customer information of a financial institution" as any information maintained by or for a financial institution which is derived from the relationship between the financial institution and its customer and is identified with the customer, and the term "document" as information in any form.

Finally, the term "financial institution" is defined as any institution engaged in the business of providing financial services to customers who maintain a credit, deposit, trust, or other financial account or relationship with the institution, including but not limited to depository institutions (as defined in section 19(b)(1)(A) of the Federal Reserve Act); brokers and dealers (as defined in section 3 of the Securities Exchange Act of 1934); investment advisers (as defined in section 202(a)(11) of the Investment Advisers Act of 1940); investment companies (as defined in section 3 of the Investment Company Act of 1940); insurance companies; loan or finance companies; credit card issuers; operators of credit card systems; and consumer reporting agencies. In addition, the FTC, after consultation with Federal banking agencies and the SEC, may prescribe regulations further defining the types of institutions that are treated as "financial institutions" for purposes of this subtitle.

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

**BANKING ACT OF 1933**

\*　　\*　　\*　　\*　　\*　　\*　　\*

[SEC. 20. After one year from the date of the enactment of this Act, no member bank shall be affiliated in any manner described in section 2 (b) hereof with any corporation, association, business trust, or other similar organization engaged principally in the issue, flotation, underwriting, public sale, or distribution at wholesale or retail or through syndicate participation of stocks, bonds, debentures, notes, or other securities: *Provided*, That nothing in this paragraph shall apply to any such organization which shall have been placed in formal liquidation and which shall transact no business except such as may be incidental to the liquidation of its affairs.

[For every violation of this section the member bank involved shall be subject to a penalty not exceeding $1,000 per day for each day during which such violation continues. Such penalty may be assessed by the Federal Reserve Board, in its discretion, and, when so assessed, may be collected by the Federal reserve bank by suit or otherwise.

[If any such violation shall continue for six calendar months after the member bank shall have been warned by the Federal Re-